ILENE J. LASHINSKY (#003073)
United States Trustee
District of Arizona

RENEE SANDLER SHAMBLIN(#017473)
Trial Attorney
230 N. 1st Ave., #204
Phoenix, Arizona 85003-1706
Telephone: (602) 682-2600
Facsimile: (602) 514-7270
E-Mail: Renee.S.Shamblin@usdoj.gov

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | CHAPTER 7 |
| JOSH D. LEVINE | Case No. 2:19-bk-10058-BKM |
| Debtor. | **Adv. No.** |
| UNITED STATES TRUSTEE,<br>Plaintiff, | **UNITED STATES TRUSTEE'S**<br>**COMPLAINT TO DENY DEBTOR'S**<br>**DISCHARGE UNDER 11 U.S.C. §**<br>**727(A)(2), (3), (4), (5), (6) AND (7)** |
| v. | |
| JOSH D. LEVINE, | |
| Defendant. | |

Plaintiff, the United States Trustee ("UST" or "Plaintiff"), by and through the undersigned counsel, files this Complaint to Deny Debtor's Discharge Under 11 U.S.C. § 727(a)(2), (3), (4), (5), (6) and (7), and makes the following allegations in support thereof.

## I. <u>INTRODUCTION</u>

Josh D. Levine has a long established pattern of fraudulently taking from others in order to further his own self-interest. Specifically, in order for Mr. Levine and his wife to enjoy a lifestyle that was not sustainable under their own income, i.e., they spent more than they earned, they made up any shortfall of income with assets that Mr. Levine fraudulently diverted from his auction house. As a result, the auction house did not have the funds necessary to pay its consignor clients.

−1−

Therefore, Mr. Levine started paying old consignors with the sales proceeds from new consignors. When new consignors' funds were depleted, Mr. Levine paid consignors with loan proceeds. When those funds were depleted, Mr. Levine started paying the old loans with the proceeds from new loans.

Eventually, Mr. Levine ran out of new consignors and new lending sources from which to obtain funds, and when the lenders withdrew funds from the auction house bank account, the auction house was unable to replenish those funds with new loan proceeds.[1] This was a problem, because a large portion of the funds in the auction house bank account were the *consignors' sales proceeds*. The auction house did not own the consignors' sales proceeds - it only had temporary possession of their funds until they were paid to the appropriate consignor. Unfortunately, this detail of "ownership" vs. "possession" had not prevented Mr. Levine from pledging the consignors' sales proceeds to lenders as collateral and from using the consignors' funds to service JLAA debts.

In an attempt to evade the lenders' collection efforts and hinder them from seizing the consignors' funds, Mr. Levine began moving the funds to new banks. In the three month period before the auction house filed bankruptcy, Mr. Levine transferred the auction house deposit account funds to three different banks: first, Comerica Bank; then Wells Fargo Bank; and finally, Sunflower Bank. Unfortunately, these efforts did nothing more than buy time for Mr. Levine to continue his fraudulent activities under the guise of operating his auction house.

As the owner of an auction house, Mr. Levine utilized various schemes in order to divert assets for his personal use. He fraudulently altered business records, misrepresented ownership of assets, and used alternate identities for his purchases. He also transferred assets from consignors to the auction house, and then transferred the assets again from the auction house to himself or to an insider, where the asset would be sold again for Mr. Levine's personal profit, and without paying

---

1 Pursuant to the terms of their loan agreements, the auction house granted the lenders both authority and access to make regular (sometimes daily) debt service withdrawals from the auction house bank account.

consignors the sales proceeds to which they were entitled.    For these reasons, and the others set forth below, the UST submits that Mr. Levine is not entitled to a discharge.

## II.   <u>JURISDICTION AND VENUE</u>

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157, and 1334.

2.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

3.    Venue is proper in the District of Arizona under 28 U.S.C. § 1409.

## III.   <u>PARTIES</u>

4.    Plaintiff, Ilene J. Lashinsky, is the United States Trustee for the District of Arizona.

5.    Plaintiff's responsibilities include supervising the administration of cases under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C., ("the Code").    Plaintiff has standing to pursue this adversary proceeding pursuant to 11 U.S.C. § 307, which provides that the United States Trustee has standing to be heard on any issue in any case or proceeding under the Code.

6.    Defendant, Josh D. Levine ("Mr. Levine" or "Debtor") resides in Maricopa County, Arizona.

## IV.   <u>PROCEDURAL AND FACTUAL BACKGROUND</u>

7.    J. Levine Auction & Appraisals ("JLAA") was an auction house.

8.    Mr. Levine was the sole member and 100% owner of JLAA.

9.    Mr. Levine has owned and operated JLAA since 2009.

10.    Mr. Levine is an experienced business professional with an auctioneer certification from the National Auctioneers Association, as well as expertise in accounting and business management.

11.    In the course of operating his auction house, Mr. Levine routinely engaged in complex transactions involving tens of thousands of dollars.

12.    A large portion of JLAA's clients were elderly people who were retired and were downsizing, or individuals who were selling items inherited from deceased loved ones.

13.    As an auction house, JLAA was known to sell property that it did not own.

−3−

14.     Instead, JLAA took items on consignment from clients and acted as an intermediary between the client (the "Consignor") and the third-party buyer in order to sell the consigned items at auction.

15.     JLAA used a form contract for its consignment sales (the "Auction Contract"), which provided as follows:

> [Consignor] retains title to and is responsible for all property until title is conveyed to the buyer(s).   [Consignor] bears the risk of loss for the property and accepts sole responsibility for obtaining insurance coverage on all property.

16.     From the time JLAA obtained possession of the consigned property, until the time title passed to the buyer, title of the property never passed to JLAA.   Title of the property always remained with the Consignor until the property was paid for and delivered to the buyer.

17.     The Auction Contract further provided as follows:

> [Consignor] hereby authorizes [JLAA] to receive and accept, on behalf of [the Consignor], the proceeds of the sale or auction in the form of cash or check or credit . . . . JLAA shall . . . D.   deduct its commission from the gross proceeds of the sale and any other applicable fees and costs . . .E. provide the net proceeds from the sale, approximately 30 to 45 business days from the date of all payments received to [the Consignor].

18.     In sum, JLAA did not own the property that was consigned to it for sale, and it only owned a portion (roughly 42%) of the gross sales proceeds.[2]

19.     JLAA was acting as a sales agent for Consignors and as such, it had a fiduciary responsibility to its Consignors to care for and manage the Consignor's property prudently by safeguarding the sales proceeds until they were transferred to the Consignor.

20.     Despite its claims of being "one of the great success stories of the auction world," JLAA

---

2  Typically, there was a 58.4% to 41.6% split between the Consignor and JLAA in the gross sales proceeds. The buyer's premium was usually a 20% surcharge on top of the hammer price, and the commission was usually 30% of the hammer price.   Therefore, if an item had a hammer price of $100, JLAA would collect $120 in gross sales proceeds from the buyer.   Of this amount, JLAA would keep $50 for itself, which consisted of $20 from the buyer's premium and $30 from the commission, and would forward $70 of the sales proceeds to the consignor. (58.4% of $120 is $70, and 41.6% of $120 is $50).

–4–

reported a loss of $715,665 in 2016, a loss of $1,654,035 in 2017, and a loss of $1,792,740 in 2018.

21.     In order to replenish the funds it had depleted and continue operating, JLAA obtained numerous loans from both commercial and individual lenders.

22.     In his efforts to obtain loans from certain individual lenders, Mr. Levine leveraged his relationships with regular JLAA customers and used deception to prey upon their sympathy.[3]

23.     For example, on May 25, 2018, Mr. Levine obtained a $140,000 loan from Ms. Sima Madison by falsely asserting that the Arizona Attorney General's Office had asked him to surrender and would put him in jail unless he obtained those funds by noon that day.

24.     On May 22, 2018, Mr. Levine sent an email to another of JLAA's regular customers, Mr. Raymond Dankel, representing that unless he was able to raise $200,000 that week, "[he] might personally be in serious jeopardy."

25.     In the same email, Mr. Levine represented that consignors were in serious arrears as JLAA had no money to pay them, and he offered to put his art and guitar collection, which he represented was "worth about $250,000," up as collateral.[4]

26.     Mr. Levine also obtained a $50,000 loan from Ms. Madison on April 25, 2018, and another $50,000 loan from Mr. Gary Robinson on May 23, 2018, when he told those customers that without the funds he would not be able to pay JLAA employees their wages.

27.     In the 12 month period preceding JLAA's Petition Date, JLAA obtained over **$2 million** in loan proceeds from various sources, but because Mr. Levine had been pilfering property from JLAA for years, even $2 million wasn't enough to dig JLAA out of the hole that he created and prevent

---

3 The UST uses the term "customer" here as someone who was a regular *purchaser* of property from JLAA auctions.
4 When Mr. Levine filed his personal bankruptcy just 15 months later, he only disclosed an art and guitar collection worth $1,8250.   Because Mr. Levine didn't disclose any transfers of personal property within 2 years of his Petition Date, it begs the question as to the whereabouts of his $250,000 art and guitar collection.

JLAA's impending bankruptcy.

28. On December 10, 2018, Mr. Levine used $10,000 of JLAA funds to retain a criminal defense attorney, Ed Novak, to represent Mr.Levine in his individual capacity.

29. Shortly thereafter, JLAA paid $40,301.16 to hire Sacks Tierney as bankruptcy counsel.

30. On March 15, 2019, JLAA filed its petition for relief under Chapter 11 of the Bankruptcy Code (the "JLAA Petition Date").

31. In its Schedules, JLAA listed $1,809,257 in unsecured debt, and $3,813,810 in secured debt.

32. Of the unsecured debt, $1,068,933.99 were unpaid sales proceeds owed to 363 Consignors. These were debts owed to people who had consigned their personal property for JLAA to sell at auction, and while JLAA represented that it sold their property and collected the purchase price, it no longer had the funds to pay the Consignors their portion of the sales proceeds.

33. On June 12, 2019, the UST filed her "*Emergency Motion to Appoint Chapter 11 Trustee, or Alternatively, to Convert Case to Chapter 7*," (the "Trustee Motion").

34. On June 21, 2019, after reviewing JLAA's response and conducting a hearing, Judge Gan issued his ruling and made 17 findings of fact and 14 conclusions of law.

35. The findings of fact included the following:

36. JLAA deposited gross consignment sales proceeds into JLAA's deposit account and typically paid Consignors with checks drawn from this account.

37. JLAA pledged some or all of its receivables to Velocity Capital Group, Kalamata Capital Group, Green Capital Funding, LLC, Cash Capital, Region Capital, CHTD Company, American Express Bank, FSB, Nawaz Qureshi and Kelly Lowry, Swift Capital, Second Wind Enterprises, Cabbage, and Headway Capital (the "Lenders").

38. JLAA asserted that much of the proceeds owed to Consignors were "swept" by certain of the Lenders from JLAA's deposit account, without regard to the claims of Consignors.

–6–

39. JLAA asserted that the loan proceeds were used to service debt, pay consignors, and pay operating expenses, but JLAA did not provide documents to evidence use of the proceeds.

40. The conclusions of law included the following:

41. Under the terms of the Auction Contracts, JLAA did not take legal title to the consigned goods or to the proceeds from the consignment sales.

42. Under the terms of the Auction Contracts, JLAA was only authorized to receive the gross consignment sale proceeds on behalf of the Consignors. JLAA was not authorized to take ownership of the gross sale proceeds.

43. Under the terms of the Auction Contracts, JLAA was authorized on behalf of the consignors to deduct only its commissions, fees, and costs from the gross sales proceeds and to pay the net proceeds to the Consignors.

44. JLAA had no authority to pledge accounts receivable as its collateral to creditors where such accounts receivable consisted of gross sales proceeds owned by the Consignors and not JLAA. The Court concluded this was evidence of fraud, dishonesty, incompetence or gross mismanagement.

45. By granting security interests in its deposit accounts and depositing gross consignment proceeds into such accounts, JLAA imperiled funds which belonged to Consignors. The Court concluded this was evidence of fraud, dishonesty, incompetence or gross mismanagement.

46. JLAA's use of consignment funds to satisfy its operational costs or to service JLAA's debts was not authorized under the consignment contracts. The Court concluded that such use was evidence of fraud, dishonesty, incompetence, or gross mismanagement.

47. JLAA acknowledged that it borrowed $2 million in the year preceding the petition date. JLAA stated that it used the loan proceeds to service debt, pay consignors, and pay operating expenses. However, over a million dollars of consignment claims were not paid and JLAA was unable to provide documentation of how the proceeds were spent, in part, due to JLAA's inadequate

–7–

financial records.   The Court concluded that JLAA's inability to explain the use of its loan proceeds was evidence of fraud, dishonesty, incompetence, or gross mismanagement.

48.     Assets of the JLAA estate were diverted away for Mr. Levine's personal benefit.   The Court concluded that this too was evidence of fraud, dishonesty, incompetence, or gross mismanagement.

49.     Ultimately, based upon Mr. Levine's history of using Consignors' gross sales proceeds and because of Mr. Levine's diversion of JLAA's assets for his personal use, the Court determined it was in the best interest of creditors to immediately appoint a Chapter 11 trustee.

50.     On June 28, 2019, the UST appointed Peter Davis as Chapter 11 trustee in the JLAA bankruptcy.

51.     Approximately two weeks later, on July 15, 2019, Mr. Davis filed a motion to convert the JLAA chapter 11 reorganization to a chapter 7 liquidation.   This motion was supported by a report that detailed his findings (the "Davis Report").

52.     In the Davis Report, Mr. Davis represented that financial analysis was a challenge in this case, as JLAA's "revenues, expenses, assets and liabilities are not properly accounted for."   Davis Report at. 2.2.

53.     Mr. Davis also represented that JLAA failed to properly segregate and protect consignor funds.   Davis Report at 2.2.

54.     Mr. Davis also found significant inventory control issues, noting that: (1)   JLAA was unable to provide a comprehensive inventory list of all of the new, pending, or sold property on JLAA's premises; (2) JLAA had maintained such poor records that it was unable to determine if its equipment, furniture, and fixtures were owned or leased; and (3) there were a significant number of items that were unaccounted for.   Davis Report at 2.3.

55.     On August 7, 2019, the Court entered an order converting JLAA's case to a liquidation under Chapter 7 of the Bankruptcy Code.

56.     On August 9, 2019, Maureen Gaughan was appointed as the Chapter 7 trustee in the JLAA case.

57.     On December 19, 2019, Ms. Gaughan filed a "*Revised Stipulated Motion for Order Approving (1) Sale of Remaining Property Free and Clear of Liens, Claims, and Encumbrances, and (2) Resolution of Administrative Rent Claim of Landlord*" (the "Motion").   In support of the Motion, Ms. Gaughan submitted the "*Declaration of Karen Flaaen*" (the "Flaaen Declaration"), a paralegal who had spent months working to sort through and identify the property left in JLAA's warehouse.

58.     In the Flaaen Declaration, Ms. Flaaen represented that she was contacted by several people who had consigned items to JLAA, but after checking, Ms. Flaaen found that the property owned by those individuals had never been input into JLAA's auction management software program.   Even after expending much effort and walking through the warehouse with these consignors, the property they consigned was never able to be located.

59.     Ms. Flaaen further represented that she undertook significant effort to identify the owners of various personal property items stored on shelves in the JLAA warehouse, but that this proved difficult because the items were not individually identified with an inventory number.   Instead, items were placed in boxes with only a consignor number.   Ms. Flaaen reached out to those Consignors, who came to JLAA's warehouse to retrieve their items, only to find out that the consignor numbers on the boxes were incorrect and the items in the boxes were not theirs.

60.     Many other items had no identifying information at all, and despite her considerable effort, Ms. Flaaen was unable to determine who owned the property or how it was acquired.

61.     On August 12, 2019, Mr. Levine filed a petition for relief under Chapter 7 of the Bankruptcy Code (the "Levine Petition Date"), which included substantially the same debts as those that were listed in the JLAA case.

–9–

# V. BASIC FACTS PERTAINING TO ALL JLAA AUCTIONS

## A. JLAA Used "Auction Flex" Auction Management Software

62.     Since 2011, JLAA has utilized an auction management software program called Auction Flex.

63.     Auction Flex is the market leader in auction software, described as a "one stop shop" that provides everything needed to run an auction business.    It is used by hundreds of auction houses around the world, and it documents inventory, consignors, buyers, invoices, receipts, and more.

64.     In response to this Court's "*Order Granting United States Trustee's Motion for 2004 Examinations on the Debtor and His Non-Filing Spouse (Chelsea Wise) and for Production of Documents*" (the "2004 Order"), dated November 15, 2019, which required Mr. Levine to produce documents relating to any transfer of personal property and any transfers of JLAA inventory, Mr. Levine's consistent response was that this information was contained in JLAA's Auction Flex records.

## B. JLAA Used "Bid Wrangler" to Host its Online Auctions

65.     In August of 2018, JLAA started using an online bidding platform hosted by a company named "Bid Wrangler."[5]

66.     The Bid Wrangler bidding platform enables registered customers to place bids online for items listed for sale in JLAA's online auctions.

67.     Prior to each auction, JLAA would upload into Bid Wrangler specific information for each item that was to be listed at that auction.

68.     Between August 26, 2018 and July 28, 2019, JLAA conducted 53 online auctions using Bid

---

5 Prior to August of 2018, JLAA used a different online bidding platform hosted by a company named "Invaluable."    The UST has served a subpoena on Invaluable, but their records have not yet been provided. Because the UST has already received comprehensive bidding records from Bid Wrangler, the majority of facts and analysis contained herein will be limited to the time period in which JLAA used Bid Wrangler – from August 26, 2018 through July 28, 2019. The UST reserves the right to supplement this Complaint, as necessary, as more information becomes available.

Wrangler's online bidding platform.

69.    Bid Wrangler maintains detailed records of who placed every bid, on every item, in every one of the 53 online auctions that JLAA conducted during this time frame.

70.    The *public* details for these auctions do not include the identification of the bidder, but they do include photos, descriptions, dates, and amounts, and are still viewable on the [Bid Wrangler](#) site.

71.    Through discovery, the UST obtained the non-public details for these auctions, including the identification of who placed each and every bid in all of the 53 online auctions.

**C.    <u>Voltaire Shea and Other Alternate Identities</u>**

72.    According to records maintained by Bid Wrangler, an entity named Voltaire Shea was the most frequent bidder in JLAA auctions.

73.    Between August 26, 2018 and July 28, 2019, Voltaire Shea placed 56,119 bids on items listed in JLAA auctions.

74.    This is over five times as many bids as the next most frequent bidder in JLAA auctions, who placed 11,718 bids.

75.    In the 53 auctions that JLAA conducted between August 26, 2018 and July 28, 2019, Voltaire Shea was the winning bidder of 759 items.

76.    Voltaire Shea is registered in Bid Wrangler with the following contact information:

>    **First Name:    Voltaire**
>    **Last Name:    Shea**
>    **Address:    4362 E. Ludlow Drive, Phoenix, AZ**
>    **Phone Number:    610-739-9991**
>    **Email:    voltaireshea@yahoo.com**

77.    Mr. Levine owns 100% of an entity named Voltaire Shea, LLC.

78.    Mr. Levine's residential address is the same as the address for Voltaire Shea.

79.    Mr. Levine's phone number is the same as the phone number listed for Voltaire Shea.

80.    Mr. Levine created and used the voltaireshea@yahoo.com email address.

–11–

81.     Upon information and belief, Mr. Levine placed bids in JLAA auctions under the registered user name "Voltaire Shea."

82.     After each auction hosted by Bid Wrangler, the information regarding the winning bidder for each item would be imported into JLAA's Auction Flex software.

83.     Although Bid Wrangler's records identify Voltaire Shea as the winning bidder of 759 items in JLAA auctions, when the Chapter 7 trustee obtained JLAA's Auction Flex records in August of 2019, there was no record of a customer named "Voltaire Shea" ever winning anything.

84.     In fact, although there were over 35,000 customers (both consignors and buyers) identified in JLAA's Auction Flex records, a customer named "Voltaire Shea" did not exist.

85.     Upon information and belief, every time Voltaire Shea was listed as the winner of an item, Mr. Levine or someone acting under his direction, would replace the name "Voltaire Shea" in JLAA's Auction Flex records with different name.

86.     The name that Mr. Levine (or someone acting under his direction) used most frequently to replace "Voltaire Shea" in JLAA's Auction Flex records was "Move for Relist Inventory (sold unpaid), with the following registration information:

> **Customer Code:   C1B**
> **Company:   Move for Relist Inventory (sold unpaid)**
> **Name:   J Levine**
> **Billing Address:   951 W. Watkins Rd,   Phoenix, AZ 85007**
> **Shipping Address:   4362 E. Ludlow Drive, Phoenix, AZ   85032**

87.     The customer "Move for Relist Inventory (sold unpaid)" was the name JLAA would typically use when it wanted its Auction Flex records to indicate that the item had become a part of JLAA's inventory.

88.     Mr. Levine also used other alternate identities in JLAA's Auction Flex records, to surreptitiously acquire property from JLAA auctions.   Upon information and belief, those alternate

–12–

identities include the following names:

    a.    John Lamont
    b.    Charlie Marone
    c.    Elliott Mercer
    d.    Mitchell Bronstein

89.    By fraudulently manipulating JLA's accounts payable and accounts receivable, Mr. Levine at times would make it appear as though these alternate identities paid for the items they won at auction, even if they had not.

90.    Mr. Levine also enabled these alternate identities to use "JLA Bucks" – the JLAA equivalent of monopoly money, or a "consignor deduct" – the JLAA equivalent of a store credit – to pay their invoices, thereby enabling the "alternate identity" to acquire the property without generating any actual income for JLAA or for the Consignors.

## VI.   JLAA'S FRAUDULENT CONVERSION OF PROPERTY

**A.   After the JLAA Petition Date, JLAA Sold Consignors' Property Without Their Knowledge and Kept 100% of the Sales Proceeds**

91.    Despite JLAA's inability to pay its Consignors, Lenders, and operating expenses, JLAA (through Mr. Levine's alias Voltaire Shea), routinely outbid all other bidders in JLAA online auctions.

92.    Because JLAA frequently didn't receive any funds for the items that Mr. Levine/Voltaire Shea "won" in its auctions, this prevented JLAA from generating desperately needed revenue.

93.    The Consignor was to be paid its portion (roughly 58.4%) of the gross sales proceeds from the property that JLAA "won".   However, due to the lack of revenue from the "sale," JLAA had to dip into other funds (from loans or from other Consignors' sales proceeds) in order to pay the Consignor. With increasing frequency throughout 2018 and 2019, JLAA was unable to come up with the funds to pay Consignors for property that JLAA "won."

94.    Although JLAA would notify the Consignors that their property had been sold, it would never

–13–

inform the Consignors that JLAA (through Mr. Levine/Voltaire Shea) was the winning bidder.

95.     Concerned about fraud, some of the Consignors requested Mr. Levine to provide them with the identity of the person who purchased their property, but Mr. Levine refused, citing "policy."

96.     Some of these Consignors were not paid, but JLAA kept the property anyway, never telling the Consignor that JLAA was the "winning bidder."

97.     Next, filed its petition for bankruptcy relief and listed the Consignors as creditors in its bankruptcy case in the amount of the sales proceeds that were due to them.

98.     Although JLAA still had possession of the Consignors' property, JLAA never offered to return it to them.

99.     Instead, after the JLAA Petition Date, JLAA put this same property up for auction again.[6]

100.    This time, however, JLAA identified itself as the "Consignor."

101.    Because JLAA had not paid the original Consignor for the property, JLAA did not own the property, and it was improper for JLAA to identify itself as the Consignor.

102.    When JLAA sold the property in the post-petition auction, JLAA kept 100% of the sales proceeds for itself.

103.    JLAA fraudulently converted Consignors' property when it sold their property post-petition, as if it were owned by JLAA.

**B.      Examples of JLAA's Fraudulent Conversion of Property**

104.    Set forth below are just a few examples of the many instances of JLAA's fraudulent conversion of Consignors' property.

---

6 As described more fully below, only some of the Consignor's property was put up for auction again with JLAA.   Other property was sold on ebay, and still other property remains unaccounted for and is missing to this day.

–14–

**(1)** <u>**The Mittens, Oil on Board, by Conrad Buff**</u>

105.     Mr. Ryan Scalise consigned an oil painting by artist Conrad Buff named, "The Mittens," for JLAA to put up for auction.

106.     According to records maintained by Bid Wrangler, Voltaire Shea placed 9 bids and outbid 3 other people in its attempt to win The Mittens, and when the auction ended on February 24, 2019, Voltaire Shea was the winner with a bid of $468.[7]

107.     Although the Bid Wrangler bidding records how that Voltaire Shea was the winning bidder, Mr. Levine, or someone working under Mr. Levine's direction, changed the name of the winning bidder in JLAA's Auction Flex software to JLAA, under "J Levine Move for Relist Inventory (sold unpaid), Customer Code C1B".

108.     JLAA never informed Mr. Scalise that JLAA (via Voltaire Shea) was the winning bidder of The Mittens. Instead, JLAA merely advised Mr. Scalise of the sales price and that he would receive his payment within 30 to 45 business days.

109.     JLAA never paid the Consignor, Mr. Scalise, for The Mittens, nor did it pay him for any of the other consigned items that Mr. Scalise sold at this auction.

110.     Instead, JLAA filed bankruptcy and listed Mr. Scalise as a creditor in its schedules in the amount of his unpaid consignor proceeds of $667.30.

111.     Despite its representations to Mr. Scalise, JLAA had not actually sold The Mittens, nor had JLAA collected any funds for The Mittens.    Instead, JLAA had merely outbid all other bidders to prevent anyone else from buying it.    Then, JLAA kept The Mittens for itself without paying Mr. Scalise for his property.

---

7 The hyperlinks contained herein connect to the public auction records on Bid Wrangler or Invaluable, with dates, pictures, descriptions, and high bid amounts.

112. Although the Mittens was in JLAA's possession, because JLAA had not paid Mr. Scalise for the painting, it was still owned by Mr. Scalise.

113. Approximately two weeks after the JLAA Petition Date, on March 31, 2019, JLAA put The Mittens up for auction again.

114. Instead of listing Mr. Scalise as the Consignor, "J Levine Auction & Appraisal," was identified as the Consignor, and on April 7, 2019, The Mittens sold for $1,050.

115. JLAA did not disclose this subsequent sale to Mr. Scalise, nor did JLAA share any of the sales proceeds with him.   JLAA kept 100% of the $1,050 hammer price, plus the 20% buyer's premium (bringing the total to $1,260), for itself.

### (2)   Delta Oil on Canvas by B. Boyd

116. Ms. May Bakhtiar consigned an oil painting by B. Boyd (the "Boyd Painting") for JLAA to sell at auction.

117. Voltaire Shea placed 12 bids and outbid 5 other people in its attempt to win the Boyd Painting, and when the auction concluded on February 24, 2019, Voltaire Shea was the winner with a bid of $120.

118. Although the bidding records maintained by Bid Wrangler show that Voltaire Shea was the winning bidder, Mr. Levine, or someone working under his direction, changed the name of the winning bidder in JLAA's Auction Flex software to JLAA, under   "J Levine Move for Relist Inventory (sold unpaid), Customer Code C1B"

119. JLAA never informed Ms. Bakhtiar that JLAA (via Voltaire Shea) was the winning bidder of the Boyd Painting.   Instead, JLAA merely advised Ms. Bakhtiar of the sales price and that she would receive her payment within 30 to 45 business days.

120. JLAA never paid the Consignor, Ms. Bakhtiar for the Boyd Painting, nor did it pay her for

–16–

1    any of the other consigned items that Ms. Bakhtiar sold at this auction.

2    121.    Instead JLAA filed bankruptcy and listed Ms. Bakhtiar as a creditor in its schedules in the

3    amount of her unpaid consignor proceeds of $7,092.

4    122.    Despite its representations to Ms. Bakhtiar, JLAA had not actually sold the Boyd Painting,

5    nor had JLAA collected any funds for the painting.    On the contrary, JLAA had merely outbid all

6    other bidders to prevent anyone else from buying it.    Then, JLAA kept the Boyd Painting for itself

7

8    without paying Ms. Bakhtiar for her property.

9    123.    Although the Boyd Painting was in JLAA's possession, because JLAA had not paid for the

10   painting, it was still owned by Ms. Bakhtiar.

11   124.    On April 7, 2019, just three weeks after the JLAA Petition Date, JLAA sold the Boyd

12   Painting at auction again.

13

14   125.    Instead of listing Ms. Bakhtiar as the Consignor of the painting at this auction, "J Levine

15   Auction & Appraisal," was identified as the Consignor.

16   126.    At this 2nd auction, the Boyd Painting was sold for $431.

17   127.    JLAA did not disclose this subsequent sale to Ms. Bakhtiar, nor did JLAA share any of the

18   sales proceeds with her.    JLAA kept 100% of the $431 hammer price, plus the 20% buyer's

19   premium, (bringing the total to $517.20) for itself.

20

21              **(3)    Oil on Canvas by Christian Wilhelm Ernst Dietrich**

22   128.    Ms. Jaanus Idla consigned an oil painting by Christian Wilhelm Ernst Dietrich (the "Dietrich

23   Painting") for JLAA to sell at auction.

24   129.    According to the information publicly available on the Invaluable website, the Dietrich

25   Painting sold for $1,200.

26   130.    However, JLAA's Auction Flex records do not show any invoice for the Dietrich Painting.

27

28                                            –17–

131.     JLAA's Quickbooks records do not show any payment to the consignor, Ms. Idla, for the Dietrich Painting.

132.     Approximately six weeks after JLAA's Petition Date, the Dietrich Painting reappeared in a JLAA auction.

133.     Instead of listing Ms. Idla as the Consignor, in this auction, "J Levine Auction & Appraisal," was identified as the Consignor.

134.     JLAA did not list the Dietrich Painting as part of its inventory in its schedules.

135.     JLAA has no records documenting how the Dietrich Painting, that was purportedly owned by and consigned to JLAA by Ms. Jaanus Idla, came to be owned by JLAA.

136.     On May 5, 2019, the Dietrich Painting sold at JLAA's auction for $1,050.

137.     JLAA did not share any of the sales proceeds with Ms. Jaanus Idla.    JLAA kept 100% of the $1,050 hammer price, plus the 20% buyer's premium (bringing the total up to $1,260) for itself.

### VII.    MR. LEVINE TRANSFERRED ASSETS OUT OF JLAA FOR HIS PERSONAL BENEFIT

### A.    Property Sold on the Ebay Site "Tigbuys"

138.     As early as 2003, Mr. Levine has been selling items online on ebay.

139.     There are several thousand customer reviews on his ebay account feedback page that identify and describe various items Mr. Levine has sold over the years.

140.     In order to sell items on ebay, you need to have an ebay user name.

141.     From 2003 to 2014, Mr. Levine sold items under his ebay account with the user name "kookootoys".

142.     In 2014, Mr. Levine changed the user name on his ebay account from "kookootoys" to "jlevineauction".

143.     On August 13, 2019, the day after Mr. Levine's Petition Date, Mr. Levine changed his ebay

–18–

user name from "jlevineauction" to "tigbuys" ("Tigbuys Ebay").

144.    Several months prior to Mr. Levine's Petition Date, Mr. Levine began taking action to broaden Tigbuys online presence and to promote the future Tigbuys Ebay store.

145.    For example, in March of 2019, Mr. Levine purchased the tigbuys.com domain name from GoDaddy.com, and he created the tigbuys.com website.

146.    Mr. Levine also created the Tigbuys page on facebook and was an administrator on the page.

147.    Mr. Levine answered inquiries from potential customers regarding the value of assets on the Tigbuys facebook page and announced that Tigbuys was working statewide to buy estates and antiques of all kinds.

148.    Mr. Levine also made posts on his on his personal facebook page to promote the Tigbuys facebook page.

149.    Upon information and belief, Mr. Levine's works with Steve Wahl in the Tigbuys business venture.

150.    Without Consignors' knowledge or consent, Mr. Levine transferred property that had been consigned for JLAA to sell at auctions and put it up for sale on the Tigbuys Ebay store, for his personal benefit.

151.    Set forth below are just a few examples of the many instances where Mr. Levine transferred Consignors' property on the Tigbuys Ebay store.

**(1)    Heddon Dowagiac 100 Bluntnose Minnow Fishing Lure w/ Box**

152.    JLAA's Auction Flex records show that Mr. Brett Reiss consigned his Heddon Dowagiac 100 Bluntnose Minnow Fishing Lure w/ Box (the "Antique Fishing Box") for JLAA to sell at auction.

153.    JLAA's auction of the Antique Fishing Box was one of the last auctions JLAA conducted before its Chapter 11 case was converted to Chapter 7.    The auction began on July 12, 2019, and

–19–

ended on July 21, 2019.

154.     According to records maintained by Bid Wrangler, Voltaire Shea placed five (5) bids and outbid seven other people in its attempt to win the Antique Fishing Box, and when the auction ended Voltaire Shea was the winner with a bid of $155.

155.     Although Bid Wrangler shows Voltaire Shea was the winning bidder, Mr. Levine, or someone working under his direction, changed the name in JLAA's Auction Flex records from "Voltaire Shea" to "Mitchell Bronstein".

156.     Upon information and belief, Mitchell Bronstein is a made up name for a person who is not a real JLAA customer.

157.     Upon information and belief, Mr. Levine used the name Mitchell Bronstein in order to acquire property for himself.

158.     According to JLAA's records, Mitchell Bronstein's name and customer data were first entered into JLAA's Auction Flex software on July 7, 2019.   Mr. Bronstein was listed with an address that doesn't exist (6661 Duncan Drive, Phoenix, AZ 85033) a non-working phone number (602-729-9966), and a non-working email address (mbronstein@yahoo.com).

159.     According to JLAA's Auction Flex records, Mr. Bronstein paid "cash" for the Antique Fishing Box.

160.     When Mr. Levine was questioned about Mr. Bronstein at his 2004 exam, Mr. Levine testified that even though JLAA's Auction Flex records identify Mr. Bronstein as the buyer of the Antique Fishing Box, Mr. Levine and Steve Wahl were the actual buyers because Mr. Bronstein was a "deadbeat" and "the guy just didn't pay his bill."[8]

---

[8]  Although Mr. Levine initially testified that "we" (Mr. Levine and Mr. Wahl together) purchased the Antique Fishing Box, Mr. Levine later testified that it was only Mr. Wahl who made the purchase.

–20–

161.     The reality was, Mr. Bronstein was a fake identity that Mr. Levine used in Auction Flex.

162.     Mr. Mitchell Bronstein wasn't a deadbeat, because nobody named Mr. Bronstein ever even placed any bids for the Antique Fishing Box. The winning bidder for the Antique Fishing Box was Mr. Levine, under his alias Voltaire Shea.

163.     Mr. Levine deprived the JLAA estate of the funds it would have received by creating a shill buyer who generated no revenue for the estate.

164.     The Antique Fishing Box was not listed as a part of Mr. Levine's property in his bankruptcy schedules.

165.     Less than a week after Mr. Levine's Petition Date, Mr. Levine posted the Antique Fishing Box for sale on the Tigbuys Ebay store.

166.     On August 25, 2019, the Antique Fishing Box sold on the Tigbuys Ebay store for $325.00.

167.     The Consignor, Mr. Reiss, was never paid for the Antique Fishing Box, or for many of the other items that he consigned with JLAA.

168.     JLAA stole the Antique Fishing Box from Mr. Reiss, and then Mr. Levine stole it from JLAA in order to sell it on his Tigbuys Ebay site for his personal benefit.

**(2)     <u>Charles Loloma Bolo</u>**

169.     After the death of her husband, Col. Park Shaw, Mrs. Cherri Shaw consigned several items from his estate for JLAA to sell at auction.

170.     One of those items was a bolo tie designed by the highly influential Native American artist Charles Loloma (the "Loloma Bolo").

171.     JLAA put the Loloma Bolo up for auction on November 25, 2016.

172.     According to the online bidding site Invaluable, the Loloma Bolo sold for $3,500.

173.     However, according to JLAA's Auction Flex records, the Loloma Bolo was never sold.

There is no invoice, nor are there any other JLAA records to document what happened to the Loloma Bolo.

174.    The Loloma Bolo was never returned to the consignor, Mrs. Cherri Shaw, nor was she ever paid for this valuable piece from her husband's estate.

175.    The Loloma Bolo was not listed as a part of JLAA inventory in JLAA's bankruptcy schedules.

176.    The Loloma Bolo was not listed as a part of Mr. Levine's property in his bankruptcy schedules.

177.    180.    Shortly after Mr. Levine's Chapter 7 Petition Date, Mr. Levine posted the Loloma Bolo for sale on the Tigbuys Ebay store.

178.    On August 25, 2019, the Loloma Bolo sold on the Tigbuys Ebay store for $860.

179.    On October 28, 2019, Mr. Levine deposited a check for $800 into his personal Wells Fargo bank account.    The check was issued from "TIG Investment Group," was signed by Steve Wahl, and the memo line indicated "Col Shaw Bolo."

180.    JLAA stole the Loloma Bolo from Ms. Shaw, and then Mr. Levine stole the Loloma Bolo from the JLAA estate in order to sell it on the Tigbuys Ebay store for his personal monetary gain.

**(3)    Rumba Lithograph**

181.    Amy Oroshnik consigned several items for JLAA to sell at auction.

182.    One of those items was a framed lithograph named "Rumba" by acclaimed Mexican artist Miguel Covarrubias (the "Rumba Lithograph").

183.    JLAA's auction of the Rumba Lithograph began on November 18, 2018 and concluded on November 25, 2018.

184.    Fifty-nine (59) competing bids were placed for the Rumba Lithograph by seven different

–22–

bidders, and of those, seventeen (17) bids were placed by Voltaire Shea.   When the auction ended Voltaire Shea was the winner with a bid of $445.

185.    Although Bid Wrangler's bidding records identify Voltaire Shea as the winning bidder, Mr. Levine, or someone working under his direction, changed the name in JLAA's Auction Flex records from "Voltaire Shea" to "J Levine Move for Relist Inventory (sold unpaid), Customer Code C1B".

186.     "J Levine Move for Relist Inventory (sold unpaid)" did not pay anything to JLAA to acquire this piece of art. The invoice remains "Unpaid" in JLAA's Auction Flex records.

187.    Despite the fact that it was on the verge of filing bankruptcy, JLAA outbid all others with a shill bidder, and prevented JLAA from generating any revenue from the sale of the Rumba Lithograph

188.    On August 25, 2019, less than two weeks after Mr. Levine's Petition Date, the Rumba Lithograph was posted for sale on the Tigbuys Ebay store.

189.    On August 31, 2019, the Rumba Lithograph was sold on the Tigbuys Ebay site for $675.

190.    Ms. Oroshnik was never paid anything for the sale of the Rumba Lithograph, or for any of the other items she consigned with JLAA. Instead, she is listed as a creditor who is owed $4,675 in both the JLAA and Levine bankruptcy cases.

191.    JLAA stole the Rumba from Ms. Oroshnik, and then Mr. Levine stole the Rumba out of the JLAA estate in order to sell it for his personal benefit.

**(4)   18k White Gold Diamond Tennis Necklace**

192.    The Joanne Kwan Trust consigned an 18k white gold diamond tennis necklace (the "Diamond Necklace") for JLAA to sell at auction.

193.    JLAA's auction of the Diamond Necklace began on November 4, 2018 and ended on November 11, 2018.

−23−

194.     According to Bid Wrangler, seventy-four (74) competing bids were placed for the Diamond

Necklace by nine different bidders, and of those, eighteen (18) bids were placed by Voltaire Shea.

When the auction ended Voltaire Shea was the winner with a bid of $2,750.

195.     Despite all of the bidding and interest in the Diamond Necklace, according to JLAA's

Auction Flex records, the Diamond Necklace never sold.

196.     Although JLAA's Auction Flex records indicate that it no longer had possession of the

Diamond Necklace, there is no invoice or sales receipt to identify a buyer, the purchase price, and

how, when, or if a purchase price was paid.

197.     JLAA never paid the Joanne Kwan Trust any sales proceeds for the Diamond Necklace, or for

many of the other items that the Joanne Kwan Trust consigned to JLAA.    The Joanne Kwan Trust is

listed as a creditor in both the JLAA and the Levine bankruptcy cases who is owed $25,000 for

unpaid consignor sales proceeds.

198.     Shortly after Mr. Levine's Petition Date, the Diamond Necklace appeared for sale on the

Tigbuys Ebay store for $8,000.

199.     When questioned about the Diamond Necklace at his 2004 exam, Mr. Levine testified that the

person who won the Diamond Necklace at auction didn't pay for it because it was damaged, and so

Mr. Levine personally bought it for the amount that the winning bidder should have paid.

200.     Specifically, Mr. Levine testified as follows:

> The winning bidder did not pay. . . . [The Diamond Necklace] actually
> needed to be repaired when they came to pick it up, and I was going to buy
> it for my wife for Christmas and I just couldn't. . . . I wanted to buy it for
> the amount that the [winning bidder] had not paid.   The reason it had not
> been paid is because it was damaged and we were afraid that the [winning
> bidder] would be upset."

201.     Mr. Levine also testified that after he purchased the Diamond Necklace, he sold it to Steve

Wahl, but he couldn't remember when he sold it, or how much Mr. Wahl paid for it.

–24–

202.    Mr. Levine lied under oath in order to hide the fact that he (under the alias Voltaire Shea) was the winning bidder of the Diamond Necklace.    There was no other "winning bidder" who refused to pay, thereby opening the door for Mr. Levine to acquire the Diamond Necklace at a bargain price. The entire time, the winning bidder was Mr. Levine through his alias Voltaire Shea.

203.    Further, there are no records to indicate that Mr. Levine ever paid anything at all to JLAA for the Diamond Necklace, and the Consignor (the Joanne Kwan Trust) never received payment.

204.    The Diamond Necklace was not listed as a part of Mr. Levine's property in his bankruptcy schedules, nor was it listed as property that he had transferred within two years of his Petition Date in his Statement of Financial Affairs.

205.    Despite the fact that it was on the verge of filing bankruptcy, Mr. Levine outbid all others on this valuable item under his "Voltaire Shea" alias and prevented JLAA from generating any revenue from the sale of the Diamond Necklace.

206.    JLAA stole the Diamond Necklace from the Joanne Kwan Trust, then Mr. Levine stole the Diamond Necklace from JLAA.

207.    Mr. Levine then profited by selling the stolen Diamond Necklace to Steve Wahl, where it was placed for sale on the Tigbuys Ebay store.

    **(5)    Taylor Model 510 Acoustic Guitar**

208.    After the death of his father, Mr. Eric Covill consigned his father's extensive guitar collection (consisting of 27 guitars) for JLAA to sell at auction.

209.    One of the guitars was a Taylor Model 510 Acoustic Guitar with Hardshell Case (the "Taylor Guitar").

210.    According to JLAA's Auction Flex invoice, the auction concluded on October 29, 2016, and Mr. John Lamont was listed as the winner of the Taylor Guitar with a bid of $1,200.

211.    Upon information and belief, nobody named "John Lamont" ever placed any bids on the

–25–

Taylor Guitar.

212.    Upon information and belief, the name "John Lamont" is an alias that Mr. Levine used in order to acquire the Taylor Guitar for himself.

213.    Predictably, "Mr. Lamont" never paid for the purchase of the Taylor Guitar.

214.    Even though Mr. Lamont never paid the invoice for the Taylor Guitar, on November 30, 2016, JLAA issued a check to the Consignor (Mr. Covill) to pay him his portion of what JLAA should have collected in sales proceeds.

215.    Because JLAA paid the Consignor, the Taylor Guitar become part of JLAA's inventory.

216.    There are no records to document that JLAA ever sold or transferred the Taylor Guitar prior to the JLAA Petition Date

217.    Notwithstanding the foregoing, when JLAA filed its bankruptcy schedules, the Taylor Guitar was not listed as a part of its inventory.

218.    The Taylor Guitar was not listed as a part of Mr. Levine's property in his bankruptcy schedules, nor was it listed as property that he had transferred in his Statement of Financial Affairs.

219.    Less than a week after Mr. Levine's Petition Date, on August 18, 2019, Mr. Levine posted the Taylor Guitar for sale on the Tigbuys Ebay store.

220.    On August 25, 2019, the Taylor Guitar was sold on the Tigbuys Ebay store for $611.

221.    Mr. Levine stole the Taylor Guitar from the JLAA estate and sold it on the Tigbuys Ebay store for his personal benefit.

**B.    Property Transferred to an Insider.**

222.    JLAA often inappropriately transferred property to insiders.    Property that should have been listed as being owned by JLAA inexplicably turned up in a subsequent auction as being owned by an insider of JLAA who had never paid for the property.    Set forth below are just a few of the many examples of these transfers to insiders.

−26−

**(1)**   **Swiss One Troy Ounce 999.9 Fine Gold Coin to Steve Wahl**

223.    The Estate of Billie Jo Dickerson consigned a Swiss One Troy Ounce 999.9 Fine Gold Coin (the "Swiss Gold Coin") for JLAA to sell at auction.

224.    JLAA's auction of the Swiss Gold Coin concluded on November 26, 2017, and according to JLAA's Auction Flex records, "J. Levine Move for Relist Inventory (sold unpaid), Customer Code C1B" was the winner with a bid of $1,050.

225.    JLAA paid the purchase price with a JLAA corporate credit card from US Bank (ending in 5759), and the Consignor (the Estate of Billie Jo Dickerson), was paid its sales proceeds with a check issued on December 22, 2017.

226.    Because JLAA paid the Consignor, the Swiss Gold Coin became part of JLAA's inventory.

227.    After its purchase of the Swiss Gold Coin, there are no records to document that JLAA ever sold or transferred the coin prior to the JLAA Petition Date

228.    Notwithstanding the foregoing, when JLAA filed its bankruptcy schedules, the Swiss Gold Coin was not listed as a part of its inventory.

229.    On May 24, 2019, while JLAA was in bankruptcy, the Swiss Gold Coin reappeared in another JLAA auction.

230.    This time, the consignor of the Swiss Gold Coin was not JLAA, or even, "J Levine Move to Relist Inventory (sold unpaid)," but was "Steve Wahl, TIG Investment."

231.    There are no records to document how "Steve Wahl, TIG Investment" came to be the owner of the Swiss Gold Coin, nor are there any records that document a payment from "Steve Wahl, TIG Investment" to JLAA for the Swiss Gold Coin.

232.    Upon information and belief, "Steve Wahl, TIG Investment" never paid JLAA for the Swiss Gold Coin.

233.    On June 2, 2019, the auction closed and the Swiss Gold Coin sold for $1,250.

–27–

234. JLAA did not take its typical 30% commission on the sale. Instead, JLAA took zero for a for a commission, and on June 13, 2019, JLAA issued a check to "Steve Wahl, TIG Investment," for 100% of the sales proceeds for the Swiss Gold Coin.

235. Upon information and belief, Mr. Levine diverted a valuable asset out of the JLAA estate to Steve Wahl, his Tigbuys Ebay business partner.

**(2)** **1957 Pahlavi Reza Shah Gold Coin to Steve Wahl**

236. Sima Madison consigned a 1957 Pahlavi Reza Shah Gold Coin (the "Shah Gold Coin") for JLAA to sell at auction.

237. JLAA (through Voltaire Shea) placed 8 bids in its attempt to win the Shah Gold Coin, and when the auction ended on October 7, 2018, Voltaire Shea was the winner with a bid of $290.

238. Although Bid Wrangler's bidding records show Voltaire Shea was the winning bidder, Mr. Levine, or someone working under his direction, changed the name of the winning bidder in JLAA's Auction Flex software to "J Levine Move for Relist Inventory (sold unpaid), Customer Code C1B"

239. JLAA never paid the Consignor, Ms. Madison, for the Shah Gold Coin, nor did it pay her for many of the other consigned items that she had consigned at this auction.

240. Instead, when JLAA filed bankruptcy five months later, JLAA listed Ms. Madison as an unsecured creditor who was owed unpaid consignor proceeds in the amount of $135,800.70.[9]

241. JLAA, (through Mr. Levine's alias Voltaire Shea), outbid all other bidders to prevent anyone else from buying the Shah Gold Coin, and prevented JLAA from generating any revenue from the sale of the Shah Gold Coin. Then, without paying Ms. Madison for her property, JLAA kept the Shah Gold Coin for itself.

242. Approximately five months later, (while JLAA was a debtor-in-possession in Chapter 11), the

---

9 Ms. Madison is owed unpaid consignor proceeds from four auctions.

Shah Gold Coin reappeared in a new JLAA auction.

243.     This time, however, the consignor of the Shah Gold Coin was not identified as Ms. Madison, or even as "J. Levine Move for Relist Inventory (sold unpaid)," but was "Steve Wahl, TIG Investment."

244.     There are no records to show how "Steve Wahl, TIG Investment" came to be the owner of the Shah Gold Coin.

245.     There are no records to evidence payment from "Steve Wahl, TIG Investment" to JLAA for the Shah Gold Coin.

246.     In JLAA's second auction of the Shah Gold Coin there were 49 competing bids placed, 15 of which were placed by Voltaire Shea, and when the auction ended on June 2, 2019, Voltaire Shea was (again) the winner, this time with a bid of $340.

247.     Despite being the winning bidder at the auction, there is no invoice or receipt in JLAA's Auction Flex records to indicate that anyone ever paid for the Shah Gold Coin at this auction.

248.     On June 3, 2019, Mr. Levine, or someone working at his direction, altered JLAA's Auction Flex records to change the status of this item from "sold" to "not sold."

249.     Neither JLAA nor Mr. Levine have provided any records to indicate what happened to the Shah Gold Coin, or where it is today.

250.     Mr. Levine not only transferred a valuable asset out of the JLAA estate in order to have Steve Wahl, his ebay Tigbuys business partner sell it, but he took the asset from the original consignor without paying her any compensation.

                    **(3)     "Silent Warmth" Oil Painting to Gregg Granger**

251.     Doug Campbell consigned a painting called "Silent Warmth" by artist Ronal Parlin (the "Parlin Painting") for JLAA to sell at auction.

252.     JLAA's auction of the Parlin Painting started on December 22, 2018 and concluded on

December 30, 2018.

253.    According to Bid Wrangler, forty-two (42) competing bids were placed for the <u>Parlin Painting</u>, and twenty (20) of those bids were placed by Voltaire Shea. When the auction ended Voltaire Shea was the winner with a bid of $340.

254.    Although Bid Wrangler shows Voltaire Shea was the winning bidder, Mr. Levine, or someone working under his direction, changed the name of the winning bidder in Auction Flex from Voltaire Shea to "J Levine Move for Relist Inventory (sold unpaid), Customer Code C1B"

255.    JLAA did not pay Mr. Campbell, the consignor of the painting, anything to acquire the painting.

256.    Although it was experiencing significant financial distress and had just retained both bankruptcy counsel and criminal defense counsel,    Mr. Levine outbid all others with a shill bidder and prevented JLAA from generating any revenue from the sale of the Parlin Painting. Then, without paying Mr. Campbell anything for his property, JLAA kept the Parlin Painting for itself.

257.    On March 16, 2019, the day after JLAA's Petition Date, the Parlin Painting reappeared in a new JLAA auction.

258.    This time, however, the consignor of the Parlin Painting was not "J Levine Move to Relist (sold unpaid)," but was "Gregg Granger."

259.    Gregg Granger is Mr. Levine's childhood friend, and although Mr. Granger lives in Florida, Mr. Levine persuaded Mr. Granger to commute back and forth between Phoenix and Florida, in order to be engaged as a "consultant" for JLAA at a salary of $168,000/year.

260.    On JLAA's Petition Date, Mr. Granger switched from a "consultant" to an 'employee" of JLAA and was given a raise to $174,000/year.

261.    There are no records to evidence how Gregg Granger ever came to be the owner of the Parlin Painting.

–30–

262. Upon information and belief, Gregg Granger never paid JLAA for the Parlin Painting.

263. When the second auction of the Parlin Painting concluded on March 24, 2019, the painting sold for $290.

264. On April 3, 2019, JLAA paid Mr. Granger consignor's sales proceeds of 85% of the sales price, and JLAA received the balance plus a 20% buyer's premium.

265. The original Consignor, Mr. Campbell, received nothing, and is listed as a creditor in both the JLAA and Levine bankruptcy cases with a claim for unpaid consignor proceeds.

266. Mr. Levine not only transferred a valuable asset out of the JLAA estate in order to benefit Mr. Granger, but he stole the asset from the original Consignor without paying him any compensation.

### (4) Serbian Order of the White Eagle Medal to Gregg Granger

267. After her husband passed away, Mrs. Gloria Patzer needed to downsize and she consigned several items for JLAA to sell at auction.   One of those items was a "Serbian Order of the White Eagle Medal" (the "Serbian Medal").

268. JLAA notified Mrs. Patzer that the Serbian Medal[10]  didn't sell at the initial auction and that they would put it up for sale another auction.

269. However, JLAA never notified Mrs. Patzer of another auction where the Serbian Medal was put up for sale.

270. JLAA never paid Mrs. Patzer for the Serbian Medal.

271. JLAA never returned the Serbian Medal to Mrs. Patzer.

272. JLAA did not list the Serbian Medal in its statements and schedules in its bankruptcy case.

273. On March 16, 2019, the day after JLAA's Petition Date, the Serbian Medal reappeared in a

---

10 Although the public records on the Invaluable website indicate that the Serbian Medal sold for $200, JLAA informed Mrs. Patzer that the item did not sell.   r

new JLAA auction.

274.    This time, however, the consignor of the Serbian Medal was not Mrs. Patzer, but was "Gregg Granger".

275.    There are no records to evidence how Gregg Granger ever came to be the owner of the Serbian Medal.

276.    There are no records to evidence payment from Gregg Granger to JLAA for the Serbian Medal.

277.    When this second auction of the Serbian Medal concluded on March 24, 2019, the Serbian Medal sold for $150 (plus buyer's premium of 20%), for a total purchase price of $180.

278.    Mrs. Patzer was never paid for the Serbian Medal, nor was she listed as a creditor in the JLAA bankruptcy case.

279.    JLAA stole the Serbian medal from Mrs. Patzer by taking it without paying her compensation, and then Mr. Levine stole the Serbian Medal from the JLAA estate in order to benefit Mr. Granger.

C.    **Property Mr. Levine Transferred to Himself**

      (1)    **III Pompeii Sterling Silver Urns**

280.    Mr. Robert Moody consigned a pair of silver urns (the "Silver Urns") for JLAA to sell at auction.

281.    On February 27, 2016, JLAA's auction of the Silver Urns concluded and they sold for $11,500 (including the 15% buyer's premium).

282.    According to the sales invoice in JLAA's Auction Flex records, the winning bidder was named Charles Marone, and he was to pay the $11,500 for the Silver Urns via a wire transfer.

283.    Upon information and belief, nobody named Charles Marone ever actually placed a bid for the Silver Urns.

–32–

284.    Upon information and belief, Mr. Levine used the name "Charles Marone" as an alias in order to acquire the Silver Urns for himself.

285.    JLAA never received the $11,500 wire transfer.

286.    Even though JLAA never received a penny of income from the "sale" of the Silver Urns, JLAA paid Mr. Moody (the Consignor), his portion of the hammer price, in the amount of $8,500.

287.    Because JLAA paid the Consignor, the Silver Urns became part of JLAA's inventory.

288.    Approximately a year and a half later, in the fall of 2017, the Silver urns reappeared in another auction.

289.    This time, however, they were consigned by Josh Levine, in his individual capacity, with Thomaston Place Auction Galleries located in Thomaston, Maine.

290.    There are no records to evidence how Josh Levine, in his individual capacity, came to be the owner of the Silver Urns.

291.    Upon information and belief, Josh Levine never paid JLAA for the Silver Urns.

292.    Ultimately, Thomaston Place Auction Galleries sold the Silver Urns for $1,000 and paid the sales proceeds to Josh Levine.

293.    Mr. Levine deposited the sales proceeds from the Silver Urns into his personal bank account on January 8, 2018.

294.    By asserting ownership of the Silver Urns and selling them as if they were his own, Mr. Levine fraudulently diverted assets of the JLAA estate to himself.

        (2)    Raphael Lillywhite Oil Painting on Canvas

295.    Mr. Steven Stoops consigned an oil painting by artist Raphael Lillywhite for JLAA to sell at auction (the "Lillywhite").

296.    The Lillywhite was first placed up for sale in JLAA's January 15, 2017 auction, where

−33−

Invaluable records show it sold for $1,300.

297.    However, because Mr. Stoops had a $2,000 reserve on the painting, the sale did not close.

298.    JLAA did not return the Lillywhite to Mr. Stoops.

299.    In April of 2018, the Lillywhite reappeared in another JLAA auction.    This time, however, Josh Levine was identified as the consignor of the painting, instead of Mr. Stoops.

300.    There are no records to evidence how Josh Levine, in his individual capacity, came to be the owner of the Lillywhite.

301.    When this auction closed, the Lillywhite sold for $3,100.

302.    According to a JLAA Quickbooks entry from April 9, 2018, JLAA owed Mr. Levine $2,350 in consignor's sales proceeds for his consignment of the Lillywhite.

303.    According to JLAA's Quickbooks records, on January 1, 2019, JLAA paid Mr. Levine his consignor's sales proceeds from the Lillywhite by applying $2,350 as a consignor credit.

304.    Mr. Stoops was never paid for the Lillywhite.    In fact, he was never listed as a creditor, or even notified about either the JLAA or Levine bankruptcy cases.

305.    JLAA stole the Lillywhite from Mr. Stoops, and then Mr. Levine stole the Lillywhite from JLAA, for his personal benefit.

**D.    Other Ways Mr. Levine Has Transferred or Concealed JLAA Property**

   **(1)    Mr. Levine Used JLAA Funds to Purchase Real Estate in Scottsdale**

306.    In March of 2014, Mr. Levine withdrew $65,323.87 from the JLAA bank account in order to make a down payment on the purchase of a $680,000 residence located at 6101 E. Voltaire, in Scottsdale, Arizona (the "Voltaire Shea Residence").

307.    When asked about the transaction at JLAA's meeting of creditors, Mr. Levine confirmed that he took the funds from the business for the purchase of the Voltaire Shea residence, but testified that

–34–

he "paid it back immediately' with funds from his 401k account.

308.    The UST asked Mr. Levine to provide documentation to show that he repaid the funds from his 401k account, but such documentation was never provided.

309.    When asked about this again at a continued meeting of creditors, Mr. Levine changed his answer and asserted that he repaid JLAA by: (1) donating $22,000 of inventory to JLAA; and (2) forgiving a $42,000 debt that JLAA allegedly owed to him.

310.    The only document Mr. Levine provided to support this explanation consisted of a Quickbooks journal entry.

311.    However, the journal entry was merely an arbitrary adjustment to JLAA's general ledger and was not supported by any actual documents.

312.    The information in JLAA's bank records do not support the Quickbooks journal entry.

313.    The information in JLAA's Auction Flex records do no support the Quickbooks journal entry.

314.    Upon information and belief, Mr. Levine never repaid the $65,323.87 to JLAA.

        **(2)    Mr. Levine Used JLAA Funds to Purchase a House in Pennsylvania**

315.    Between November of 2015 and October of 2017, Mr. Levine took $120,000 from JLAA in order to purchase a residence in Allentown, PA (the "Allentown Residence."

316.    In his capacity as the owner of JLAA, Mr. Levine directed JLAA to issue regular bi-monthly payments to the owner of the Allentown Residence at the rate of $60,000 per year.

317.    After two years, when the total of $120,000 had been paid, the owner of the property transferred the Allentown Residence to Mr. Levine via quit claim deed.

318.    At the time the Allentown Residence was transferred to Mr. Levine, its fair market value was approximately $120,000.

319.    Upon information and belief, Mr. Levine never repaid the $120,000 to JLAA.

–35–

**(3)    Mr. Levine Diverted Other JLAA Assets for His Personal Use**

320.    **Credit Cards**.    Mr. Levine used JLAA business credit cards to pay personal expenses.

321.    Mr. Levine also used funds from JLAA business bank accounts to pay certain of his personal credit card bills.

322.    **Rental Income**.    For a period of time in 2017 and 2018, JLAA sublet a portion of its warehouse.

323.    The rental income from the tenant was JLAA property.

324.    Upon information and belief, Mr. Levine diverted some of these JLAA funds by depositing them into his personal bank account or by cashing the checks instead of depositing them.

325.    **JLAA Assets Sold through Other Auction Houses**. JLAA transferred many pieces of JLAA property to be sold at other auction houses.

326.    Although the sales proceeds should have been provided to JLAA (or to the original consignors), instead, they were deposited into Mr. Levine's personal bank account.

327.    **Loan Proceeds**.    In the JLAA schedules, Mr. Levine listed an unsecured loan in the amount of $248,000 to Ms. Sima Madison.

328.    JLAA provided copies of five checks from Ms. Madison and a p-note to evidence the funds Ms. Madison provided to JLAA.

329.    One of those checks, a $10,000 check dated December 6, 2018, was never deposited into JLAA's business bank account.

330.    Although Mr. Levine made the representation under oath that the $10,000 check from Ms. Madison was a loan to JLAA, Mr. Levine deposited the $10,000 check into his personal bank account, and he used those funds to pay personal expenses.

331.    Upon information and belief, Mr. Levine did not repay the above listed funds to JLAA.

–36–

# VIII. PROPERTY MISSING FROM THE ESTATE

## A. Missing Gold Bar

332.    On September 24, 2018, Mr. Levine used $63,852 of JLAA funds to purchase 95 pieces of gold and silver from a precious metals dealer named APMEX.

333.    The purchase consisted of twenty-five 1 oz. gold bars, twenty 1 oz gold coins, and fifty 10 oz. silver bars.

334.    The purchase from APMEX was made in the name of "Josh Levine of Voltaire Shea, LLC," and was delivered on September 27, 2018, to Mr. Levine's personal residence on Ludlow Drive.

335.    The gold & silver was put up for auction, and when the auction concluded, Voltaire Shea was the winning bidder on 15 gold bars, 8 gold coins, and 10 silver bars (the "Gold & Silver").[11]

336.    Although Bid Wrangler's bidding records identify Voltaire Shea as the winning bidder, Mr. Levine, or someone working under his direction, changed the name of the winning bidder in JLAA's Auction Flex software to "J Levine Move for Relist Inventory (sold unpaid), Customer Code C1B."

337.    According to Mr. Levine's 2004 exam testimony, at some point after the last auction closed, Mr. Levine put the Gold & Silver in a bag and drove it to the home of Dr. Nawaz Qureshi and Kelly Lowery, where he gave it to them as a payment on JLAA's loan.

338.    According to discovery documents provided by Dr. Nawaz Qureshi and Kelly Lowery, Mr. Levine delivered a total of 14 gold bars, 8 gold coins, and 10 silver bars to them.

339.    As JLAA had **15 gold bars**, but it only delivered **14 gold bars** to Dr. Qureshi & Ms. Lowery, there was one gold bar retained by JLAA that remains unaccounted for.

340.    There are no records in JLAA's Auction Flex software that show JLAA ever put this

---

11 Pictures, descriptions, and bidding details for the gold and silver are available on Bid Wrangler under the various lot numbers for each item.

1   remaining gold bar up sale in another auction.

2   341.    JLAA did not list the last remaining gold bar in its bankruptcy schedules.

3   342.    JLAA has failed to provide any documentation that evidences the disposition and location of

4   the gold bar.

5

6   **B.    Reclined Quan Yin Ivory Style Tusk Figure**

7   343.    Mrs. Danielle Rovinsky consigned numerous items for JLAA to sell at auction, one of which

8   was the Reclined Quan Yin Ivory Style Tusk Figure (the "Reclined Quan").

9   344.    According to the bidding records maintained by Bid Wrangler, 44 competing bids were

10  placed for the Reclined Quan by 10 different bidders, and 13 of those bids were placed by Voltaire

11  Shea.   When the auction ended on January 13, 2019, Voltaire Shea was the winner with a bid of

12  $300.

13

14  345.    Although Bid Wrangler shows Voltaire Shea was the winning bidder, Mr. Levine, or someone

15  working under his direction, changed the name of the winning bidder in JLAA's Auction Flex

16  records to "J Levine Move for Relist Inventory (sold unpaid)," under Customer Code C1B.

17  346.    JLAA did not pay anything to the Consignor, Mrs. Rovinsky.

18  347.    Six weeks later, on February 22, 2019, the Reclined Quan reappeared in a new JLAA auction.

19
20  348.    This time, however, the consignor of the Reclined Quan was not identified as Mrs. Rovinsky,

21  but was "J Levine, Abandoned Property".

22  349.    There was no legitimate basis for the Reclined Quan to be categorized as "Abandoned

23  Property."

24  350.    Mrs. Rovinsky had not been paid for the Reclined Quan, and although JLAA had possession

25  of the property, the Reclined Quan was still owned by Ms. Rovinsky.

26  351.    In the second auction of the Reclined Quan, there were 22 bids placed by 9 different bidders,

27

28                                              −38−

and 8 of those bids were placed by Voltaire Shea. When the auction ended on March 3, 2019, Voltaire Shea was, again, the winning bidder.

352. Although Bid Wrangler shows Voltaire Shea was the winning bidder, JLAA's Auction Flex records identify "J Levine Move for Relist Inventory (sold unpaid)" as the buyer of the Reclined Quan.

353. JLAA filed its bankruptcy petition just eleven days later.

354. 359. JLAA did not include the Reclined Quan on its list of inventory on file with the Court.

355. 360. The Reclined Quan never appeared in another JLAA auction.

356. 361. JLAA has not disclosed where the Reclined Quan is today.

357. JLAA has failed to keep or preserve any recorded information that would demonstrate the whereabouts of the Reclined Quan.

358. Mrs. Rosinsky was never paid for the Reclined Quan, or for any of the other items she consigned with JLAA.

359. Mrs. Rosinsky is listed as creditor in both the JLAA and the Levine bankruptcy cases who is owed $27,139.40 in unpaid consignor proceeds.

**C.  Other Property Missing from JLAA's Estate**

360. Set forth below are just a few examples of the many additional items that were consigned to JLAA for sale at auction, but have disappeared after JLAA (through "Voltaire Shea") was the auction's winning bidder.

361. A JLAA Auction Flex invoice identifies "J Levine Move to Relist Inventory (sold unpaid)" as the buyer of an **18K gold Cuban link** bracelet for $1,478.90 in November of 2017. Although there are no subsequent sales of this item recorded in JLAA's records, the bracelet was not listed in JLAA's schedules.

−39−

362. A JLAA Auction Flex invoice identifies "J Levine Move to Relist Inventory (sold unpaid)" as the buyer of a **Frank Lloyd Wright Studio Architectural Spire** for $2,314.80 in November of 2017. Although there are no subsequent sales of this item recorded in JLAA's records, the spire was not listed in JLAA's schedules.

363. A JLAA Auction Flex invoice identifies "J Levine Move to Relist Inventory (sold unpaid)" as the buyer of a **Tibetan Silk Thangka** for $3,600.80 in July of 2018. Although there are no subsequent sales of this item recorded in JLAA's records, the Tibetan Silk Thangka was not listed in JLAA's schedules.

364. For the above listed items, and several others, JLAA has failed to keep or preserve recorded information that would demonstrate what happened to the property after JLAA acquired it at auction.

## IX. JLAA'S RECORDS HAVE BEEN ALTERED AND ARE WHOLLY UNRELIABLE

### A. Names of Buyers and Consignors Have Been Deleted from Auction Flex

#### (1) Voltaire Shea

365. On December 17, 2018, JLAA paid Josh Levine $6,072.30 for items consigned by "Voltaire Shea."

366. JLAA's Auction Flex records that were provided to the Chapter 11 and Chapter 7 trustee in August of 2019 do not contain any records regarding this payment, or even any records regarding the existence of a consignor named Voltaire Shea.

367. Upon information and belief, Mr. Levine, or someone working under his direction, altered or deleted all references to "Voltaire Shea" from JLAA's Auction Flex software before providing these records to the Chapter 11 and Chapter 7 trustee.

#### (2) AZ Estate Liquidators

368. Mr. Levine owns 100% of an entity named AZ Estate Liquidators, LLC.

–40–

369.     When asked at his meeting of creditors, Mr. Levine testified that AZ Estate Liquidators was never an operating entity.

370.     Upon information and belief, AZ Estate Liquidators has consigned property sold at JLAA auctions.

371.     Upon information and belief, AZ Estate Liquidators has purchased property sold at JLAA auctions.

372.     Upon information and belief, Mr. Levine, or someone working under his direction, altered or deleted all references to AZ Estate Liquidators from JLAA's Auction Flex software before providing these records to the Chapter 11 and Chapter 7 trustee.

### (3)    Other Altered Consignor Records

373.     There are many other consignors whose names have been deleted from Auction Flex, rendering it impossible to determine who owned and who is being paid for the items that sold at auction.    For example:

374.     The name, address, and all contact information for **Customer Code # JE13205** have been deleted.    This consignor was allegedly paid $227.50 on July 5, 2018.    The Auction Flex notes indicate that this customer was paid with check no. "0," but there is no such check number from any of JLAA's known bank accounts.    The list of items in the consignment order that this customer consigned in order to generate the $227.50 payment was deleted as well.

375.     The name, address, and all contact information for **Customer Code B35791** have been deleted.    This consignor was allegedly paid $374.40 on July 20, 2018.    The notes in JLAA's Auction Flex records indicate this customer was paid with check no. "22," but there is no such check number from any of JLAA's known bank accounts.

376.     The name, address, and all contact for **Customer Code JR80200** have been deleted.    This

–41–

consignor was allegedly paid with $71.50 on August 29, 2018. The notes in JLAA's Auction Flex records indicate that this customer was paid with check no "14," but there is no such check number from any of JLAA's known bank accounts.

**B.  Entire Auctions Have Been Deleted from JLAA's Auction Flex Records**

377.    On August 30, 2017, JLAA conducted its "Fabulous Firearms" auction.

378.    According to publicly available information on the Invaluable website, there were 146 firearms that were sold that day, two of which had a hammer price of $25,000 or higher.

379.    JLAA's Auction Flex records that were provided to the Chapter 11 and Chapter 7 trustee do not contain any information about this auction.

380.    JLAA has provided no sales invoices to show who bought the firearms, no receipts to show when, how, or if the buyers paid for the firearms, no consignment orders to show who consigned these firearms, and no consignment settlement reports to show if and when the consignors were paid.

381.    There are numerous other auctions that JLAA conducted for which the records were not included in the Auction Flex software provided to the Chapter 11 and Chapter 7 trustee.

382.    Upon information and belief, Mr. Levine, or someone working at his direction, fraudulently deleted or altered all records related to the Fabulous Firearms auction, and several other auctions, that should be contained in JLAA's Auction Flex records.

**C.  Quickbooks Records are Inaccurate and Potentially Fraudulent**

383.    Mr. Levine, or someone working at his direction, made false entries in Quickbooks for payments to consignors from accounts that either: (1) didn't exist; or (2) were closed at the time the alleged payments were made.

384.    Mr. Levine, or someone working at his direction, made false entries in Quickbooks by identifying payments to consignors as being made with cashier's checks, when those cashier's checks

–42–

were never actually purchased from the bank.

385.    Upon information and belief, Mr. Levine, or someone working at his direction, made certain of these Quickbooks entries to make JLAA's books and records appear as if consignors had been paid, when in fact, they weren't.

386.    There are other cashier's checks that were purchased by Mr. Levine and are documented by JLAA's banks, but they were never entered into Quickbooks.

387.    Ultimately, the Quickbooks records are replete with so many errors they are inherently unreliable.

## X.    FALSE OATH OR ACCOUNT

### A.    JLAA Statements, Schedules, Master Mailing List, Hearings & Pleadings

388.    JLAA filed its master mailing list (the "MML") contemporaneously with the JLAA petition.

389.    JLAA filed its Schedules of Assets and Liabilities, (the "JLAA Schedules") and Statement of Financial Affairs (the "JLAA SOFA") on March 29, 2019, and it then filed several subsequent amendments.

390.    Mr. Levine signed the MML, the JLAA Schedules and the JLAA SOFA under oath, attesting to their veracity and accuracy.

391.    Mr. Levine knowingly and fraudulently made many omissions and misrepresentations in the in the JLAA MML, the JLAA Schedules, the JLAA SOFA, various pleadings, and hearings, including but not limited to, the following:

392.    Mr. Levine omitted 95% of its Consignor creditors from the MML, and only corrected the MML after the UST brought the omission to the Court's attention.

393.    Mr. Levine failed to accurately answer questions in JLAA Schedule A/B, including but not limited to:    question nos. 11, 21, 22, 25, 26, 40,41, 42, 45, 61, 63, 67, 72, 76, 77, 78, 82, 84, 85, 89,

–43–

90, 91 & 92.

394.     Mr. Levine failed to accurately answer questions in the JLAA SOFA, including but not

limited to question nos. 1, 2, 3, 4, 6, 9, 13, 14, 21, and 30.

**B.     Mr. Levine's Statements, Schedules, Form 122A, Hearings and Pleadings**

395.     Mr. Levine knowingly and fraudulently made many misrepresentations in his Statements,

Schedules, Form 122A, various pleadings, and hearings, included but not limited to the following:

396.     Mr. Levine failed to accurately list all of personal property on Schedule A/B.

397.     Mr. Levine failed to accurately list his creditors in Schedule E/F.

398.     Mr. Levine failed to accurately list his income and expenses in Schedule I and J.

399.     Mr. Levine failed to accurately answer questions in his SOFA, including, but not limited to,

question nos 4, 5, 6, 7, 8, 13, 16, 17, 18, 22, 23, and 27.

400.     405.     Mr. Levine failed to provide accurate income information in Form 122A.

**C.     Testimony at 341 Meeting of Creditors and 2004 Exam**

401.     Mr. Levine testified under oath as a representative of JLAA at 341 meetings of creditors on:

April 16, 2019, May 16, 2019, and September 9, 2019.

402.     Mr. Levine testified under oath at a 2004 exam in his own Chapter 7 case on February 14,

2020.

403.     Upon information and belief, when testifying under oath at the above listed 341 meetings and

2004 exam, Mr. Levine knowingly and fraudulently made many misrepresentations and omissions.

**XI. REFUSAL TO OBEY COURT ORDER AND FAILURE
TO KEEP RECORDED INFORMATION**

404.     On November 15, 2019, this Court entered a 2004 Order requiring Mr. Levine to provide

certain documents relating to his property and financial affairs to the UST.

405.     Despite numerous attempts by the UST to obtain the documents required by the 2004 Order,

–44–

1   Mr. Levine did not comply.

2   406.    Although Mr. Levine provided a USB drive with hundreds of pages of documents, the vast

3   majority of them were non-responsive to the documents required pursuant to the 2004 Order.

4   407.    At Mr. Levine's 2004 exam, Mr. Levine asserted that he would provide the missing

5   documents as well as certain additional documents to the UST, but he never did.

6

7   408.    On February 29, 2020, the UST filed with the Court and provided Mr. Levine's counsel with a

8   comprehensive, detailed list of the outstanding items that had not been provided from the 2004 Order.

9   409.    Mr. Levine failed to provide a single document in response.

10  410.    On March 6, 2020, the UST wrote to Mr. Levine's counsel to schedule a conference to discuss

11  the documents that were outstanding from the 2004 Order.

12  411.    On March 11, 2020, the UST and Mr. Levine's counsel conducted this conference, reviewed

13  the documents and information that were to be provided from the 2004 exam as well as the

14  documents and information that were missing from the 2004 Order, and Mr. Levine's counsel assured

15

16  the UST that she would consult with Mr. Levine and provide a response.

17  412.    On March 16, 2020, Mr. Levine's counsel sent an email that she would provide details

18  regarding the missing documents in a response that she would file with the Court.    However, no

19  such details, or documents, were filed with the Court or provided to the UST.

20

21  413.    On March 31, 2020, the UST sent another letter to Debtor's counsel urging that the

22  documents be provided by April 14, 2020.

23  414.    The UST received no response.

24  415.    On May 5, 2020, the UST sent another letter to Mr. Levine's counsel requesting    specific

25  documents relating to Consignor payments.

26  416.    The UST received no response.

27

28                                          –45–

417.    To date, Mr. Levine has failed to provide the vast majority of documents required by the Court's 2004 Order, including but not limited to, the documents set forth below:

**A.    Financial Accounts**

418.    Document Request Nos 1 & 2 required Mr. Levine to provide documents for all financial Accounts (as defined in the 2004 Order) to which Mr. Levine or his spouse had signatory authority or access between January 1, 2016 and November 30, 2019.

419.    As set forth below, Mr. Levine: (1) failed to disclose the existence of seven Accounts; and (2) failed to provide the majority of documents that were required to be provided from all Accounts.

420.    **BNC National Bank 9209** – *Debtor failed to disclose the existence of this account.*    No account statements or ledger were provided.    Acct. info. was not in Quickbooks.

421.    **Capital One 6630** – *Debtor failed to disclose the existence of this account.*    No account statements or ledger were provided.    Acct. info. was not in Quickbooks.

422.    **Comerica 7067** – *Debtor failed to disclose the existence of this account.*    No statements were provided.

423.    **Comerica 3381** – *Debtor failed to disclose the existence of this account.*    No statements were provided.

424.    **Pay Pal Account** – *Debtor failed to disclose the existence of this account.*    No statements or ledger were provided.

425.    **Raymond James 5570** – *Debtor failed to disclose the existence of this account.*    No statements or ledger provided.    Acct. info is not in Quickbooks.

426.    **Western State Bank 344** – *Debtor failed to disclose the existence of this account.*    No statements or ledger provided.    Acct. info is not in Quickbooks.

427.    **BMO Harris 0550** – Debtor failed to provide 25 months of statements from Jan 2016 to January of 2018.    No ledger was provided.    Acct. info was not in Quickbooks.

428.    **Bank of America (CW)** – Statements were provided on May 22, 2020, over five months after the 2004 Order deadline.    Acct. info was not in Quickbooks

429.    **Capital One 0758** – No ledger provided.    Acct. info was not in Quickbooks.

430.    **Charles Schwab 8701** – Debtor failed to provide all statements prior to Jan 2018.    The statements that were provided are incomplete - only included 1 pg of a 7 pg stmt.    No. 130 is completely illegible.

431.    **Comerica 9527** – Debtor failed to provide 17 months of statements from January of 2016 to

–46–

May of 2017.   Failed to provide copies of cashier's checks.

432. **Great Western 4852** – Debtor only provided one statement (4/2019).

433. **Great Western 4844** – Debtor only provided one statement (4/2019).

434. **Great Western 4836** – Debtor only provided one statement (4/2019).

435. **Great Western 4318** – Debtor only provided one statement (4/2019).

436. **Optum Bank HAS** – No statements or ledger provided.   Acct. info is not in Quickbooks.

437. **Wells Fargo 7700** – No ledger provided.   Acct. info is not in Quickbooks.   Failed to provide copies of cashier's checks.

438. **Wells Fargo 2932** – No ledger provided.   Acct. info is not in Quickbooks.

439. **Wells Fargo 8290** – Missing 6 months of statements from March 2017 to August 2017.   No ledger provided.   Acct. info is not in Quickbooks.

440. **Wells Fargo 4460** - No ledger provided.   Acct. info is not in Quickbooks.   Failed to provide copies of cashier's checks.

441. **Wells Fargo 8721** - Failed to provide copies of over half of the cashier's checks from this account (he provided 25 out of 56).

**B.   Credit Card Accounts**

442.   Document request nos. 3 and 4 required Mr. Levine to provide documents for all business and personal credit card accounts.

443.   As set forth below, Mr. Levine failed to: (1) disclose the existence of ten credit card accounts; and (2) provide statements for thirty-three credit card accounts.

444. **BBVA 6886** – account not disclosed, no stmts. provided.

445. **Comenity West Elm 3186**– account not disclosed, no stmts. provided.

446. **HSBC 6080** – account not disclosed, no stmts. provided.

447. **JP Morgan 9714** – account not disclosed, no statements provided.

448. **Synchrony Living Spaces 5073** – acct. not disclosed, no stmts. provided.

449. **Synchrony Amazon 2566** (CW) – acct. not disclosed, no stmts. provided.

450. **Synchrony Care Credit 3056** – acct. not disclosed, no stmts. provided.

–47–

451. **Wells Fargo 5865** – acct. not disclosed, no stmts. provided.

452. **Wells Fargo 7206** (GG) – acct. not disclosed, no stmts. provided.

453. **Wells Fargo 7214** (MH) – acct. not disclosed, no stmts. provided.

454. **AMEX 2005** – no statements provided.[12]

455. **Macy's 0455** – missing statements prior to 8/2018 and after 6/2019.

456. **BofA 3520** – no statements provided.

457. **Barclay 9365** – no statements provided.

458. **Capital One 0842** – no statements provided.

459. **Capital One 9108** – no statements provided.

460. **Capital One 2510** – no statements provided.

461. **Capital One 0783** – no statements provided.

462. **Capital One 8760**-CW- missing stmts. prior to 3/2018 and after 7/2019.

463. **Citibank 1351** – no statements provided.

464. **Citibank 4578** – no statements provided.

465. **Citibank 0119** – no statements provided.

466. **Citibank 8675** – no statements provided.

467. **Comerica 3737** – no statements provided.

468. **Crate & Barrel 5342** – account disclosed 5 months after the deadline, only one statement provided.

469. **Discover 5449** – no statements provided.

470. **Discover 0513** – no statements provided.

---

12 There were 7 additional American Express credit cards accounts that were undisclosed.   However, the UST chose not to include them on this list because she was able to find their transaction information on the AMEX master account ending in 2005 (which was disclosed).

471.  **JP Morgan Chase 7260** – no statements provided.

472.  **JP Morgan Chase 9201** – no statements provided.

473.  **JP Morgan Chase 9872** – no statements provided.

474.  **US Bank 7157** – no statements provided.

475.  **US Bank 9672** – no statements provided.

476.  **Wells Fargo 9672** – no statements provided.

**C.    Other Documents Mr. Levine Failed to Keep and Provide**

477.    Mr. Levine also failed to provide documents relating to transfers of his personal property, transfers of JLAA owned property, or transfers of property owned by any other business venture in which Mr. Levine was engaged.

478.    Mr. Levine also failed to provide copies of various miscellaneous documents, such as car, home, and personal property insurance, and documents relating to his loan agreements with several lenders.

479.    Mr. Levine failed to maintain or refused to produce sufficient documents from which his business and personal financial transactions could be ascertained.

480.    In light of his education and business history, Mr. Levine had the sophistication and forethought to maintain proper documentation of his financial affairs.

481.    There was no reasonable justification for Mr. Levine's failure to maintain, or to produce, documentation that substantiates and explains JLAA's and Mr. Levine's loss of assets and inability to meet their liabilities.

482.    Ultimately, the UST was required to subpoena numerous third parties in order to obtain financial information in an attempt to recreate Mr. Levine's business and personal financial records.

–49–

## COUNT ONE

### TRANSFER AND CONCEALMENT WITH INTENT TO HINDER, DELAY, OR DEFRAUD A CREDITOR OR AN OFFICER OF THE ESTATE
### 11 U.S.C. § 727(a)(2)

483.    Plaintiff repeats and re-alleges paragraphs 1 through 482 herein.

484.    Within one year before and after the bankruptcy filing herein, Mr. Levine transferred and concealed property constituting property of the Debtor and property of the estate with the intent to hinder, delay, or defraud his creditors and officers of the estate.

485.    Those dispositions and concealment of property include but are not limited to the following:

a.    Mr. Levine's pre-petition transfer of the funds in JLAA's bank accounts from Comerica Bank to Wells Fargo Bank, and then from Wells Fargo Bank to Sunflower Bank;

b.    Mr. Levine's pre-petition and post-petition transfer of assets out of JLAA to be sold or used for Mr. Levine's personal benefit;

c.    Mr. Levine's pre-petition and post-petition transfer of assets out of JLAA to be sold or used for the benefit of insiders;

486.    As a result of the conduct alleged herein, Mr. Levine is not entitled to a discharge in bankruptcy under 11 U.S.C. § 727(a)(2).

## COUNT TWO

### CONCEALING, FALSIFYING, OR FAILING TO KEEP OR PRESERVE RECORDS
### 11 U.S.C. § 727(a)(3)

487.    Plaintiff repeats and re-alleges paragraphs 1 through 487 herein.

488.    Mr. Levine has concealed, destroyed, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained.

489.    The documents that Mr. Levine has concealed, destroyed, falsified, or failed to keep include but are not limited to the following:

—50—

a.  The auction records of JLAA in Auction Flex, such as invoices, consignment reports, and receipts;

b.  The banking and credit card records of JLAA;

c.  The banking and credit card records of Mr. Levine;

d.  The personal purchase and sale records of assets of Mr. Levine;

e.  All other documents from which JLAA's financial condition and business transactions might be ascertained;

f.  All other documents from which Mr. Levine's financial condition and business transactions might be ascertained.

490.  Mr. Levine's concealment, destruction, falsification, or failure to keep or preserve documents from which his or JLAA's financial condition and business transactions might be ascertained was not justified.

491.  As a result of the conduct alleged herein, Mr. Levine is not entitled to a discharge in bankruptcy under 11 U.S.C. § 727(a)(3).

<u>**COUNT THREE**</u>

**FALSE OATH OR ACCOUNT**
**11 U.S.C. § 727(a)(4)**

492.  Plaintiff repeats and re-alleges paragraphs 1 through 491 herein.

493.  Mr. Levine knowingly and fraudulently made false statements, concerning material information, under oath in this case and in the JLAA case.

494.  Mr. Levine acted with reckless disregard for the truth with respect to his disclosures, the Schedules and SOFA, and testimony in this case and in the JLAA case.

495.  The materially false oaths and statements made by Mr. Levine in this case and in the JLAA case include but are not necessarily limited to the following:

a.  False information about his income;

–51–

b.   False information about his transfers of personal property;

c.   False information about JLAA's transfers of property;

d.   False information about his and JLAA's assets;

496.   Mr. Levine knowingly and fraudulently, in or in connection with this case and with the JLAA case, attempted to obtain money, property, or advantage, for acting or forbearing to act, when he obtained property from consignors by promising to sell it at auction and deliver to them their sales proceeds, but he instead kept the proceeds to satisfy his personal and business obligations.

497.   As a result of the conduct alleged herein, Mr. Levine is not entitled to a discharge in bankruptcy under 11 U.S.C. § 727(a)(4).

## COUNT FOUR

### INSUFFICIENT EXPLANATION OF LOSS OF ASSETS
### 11 U.S.C. § 727(a)(5)

498.   Plaintiff repeats and re-alleges paragraphs 1 through 497 herein.

499.   Mr. Levine has failed to account for and explain, or to produce or identify documentation that explains, any loss of assets or deficiency of assets to meet his liabilities in this case or in the JLAA case.

500.   As a result of the conduct alleged herein, Mr. Levine is not entitled to a discharge in bankruptcy under 11 U.S.C. § 727(a)(5).

## COUNT FIVE

### REFUSAL TO OBEY A LAWFUL ORDER OF THE COURT
### 11 U.S.C. § 727(a)(6)

501.   Plaintiff repeats and re-alleges paragraphs 1 through 500 herein.

502.   By failing to provide documents that were required by this Court's 2004 Order, Mr. Levine has failed to obey a lawful order of the court.

503.   As a result of the conduct alleged herein, Mr. Levine is not entitled to a discharge in

–52–

bankruptcy under 11 U.S.C. § 727(a)(6).

## COUNT SIX

### COMMISSION OF ACTS IN A RELATED CASE
### 11 U.S.C. § 727(a)(7)

504.    Plaintiff repeats and re-alleges paragraphs 1 through 503 herein.

505.    Mr. Levine has committed acts specified in paragraphs (2), (3), (4), and (5) of Section 727(a), within one year before the date of filing his petition, in the JLAA case.

506.    By virtue of his position as the owner and managing member of JLAA, Mr. Levine is an insider in the JLAA case.

507.    As a result of the conduct alleged herein, Mr. Levine is not entitled to a discharge in bankruptcy under 11 U.S.C. § 727(a)(7).

## PRAYER FOR RELIEF

WHEREFORE the United States Trustee respectfully requests that:

A.    Judgment be entered against Mr. Levine and in favor of the United States Trustee in this case;

B.    Mr. Levine be denied a discharge in bankruptcy under 11 U.S.C. § 727; and

C.    The Court grant any other relief that the Court deems just and appropriate.

RESPECTFULLY SUBMITTED this 30th day of June, 2020.

ILENE J. LASHINSKY
United States Trustee
District of Arizona

/s/ RSS (AZ#017473)
RENEE SANDLER SHAMBLIN
Trial Attorney

–53–